BENSON LUMBER COMPANY v. ERIC L. THORNTON AND OTHERS.
MARIAN DINSMOOR AND ANOTHER, INTERVENERS.[1]

January 29, 1932.

No. 28,446.

[1]Reported in 240 N. W. 651.

*Junell, Oakley, Driscoll & Fletcher* and *David Bronson,* for appellant First National Bank of Minneapolis.

*Walsh, Jackson, Walsh & Yackel,* for appellant Central Trust Company.

*Catherwood, Hughes & Alderson,* for intervener-appellants.

*Oscar Hallam* and *John I. Davis,* for respondent.

OLSEN, J.

Appeals by defendants Central Trust Company and the First National Bank of Minneapolis from separate orders denying their motions for a new trial, and appeal by the interveners, Marian Dinsmoor and Viola Dinsmoor Hobson, from an order denying their motion for a new trial.

The action involves the ownership and rights to liens upon 62 shares of the capital stock of the plaintiff corporation. The plaintiff claims, in substance, that in November, 1909, the 62 shares of stock were sold and issued to defendant Eric L. Thornton and that he has ever since remained the owner thereof on the books of the plaintiff; that in 1925 and 1926 he became indebted to the corporation in the aggregate sum of $6,396.53, no part of which has been paid; and that plaintiff has a first lien upon the stock for this amount. It asks to have its lien established and the stock sold to satisfy same.

Briefly stated, the defendant Central Trust Company claims that it is the owner of 20 of these shares of stock, free of any lien or claim of any of the other parties, and asks that the plaintiff be required to issue new certificates of stock to it in place of the certificates it now holds.

The defendant First National Bank of Minneapolis claims that it holds 22 other shares of this stock as collateral security for a note of defendant Eric L. Thornton, and has a lien thereon to the amount of $2,300 and interest superior to the rights of any of the other parties, and asks dismissal of the action as to it.

The interveners, Marian Dinsmoor and Viola Dinsmoor Hobson, claim to be the equitable owners of all the 62 shares of stock, and that their ownership and rights thereto are superior to any liens or interest of any of the other parties, and ask appropriate relief.

More particulars as to these respective claims will be stated later.

The case was tried to the court and findings of fact and conclusions of law made. The conclusions were to the effect that plaintiff had a first lien upon the 62 shares of stock in the amount of $6,101 and interest, for which amount it should have judgment against Eric L. Thornton; that the Central Trust Company owned 20 shares of the stock, subject to plaintiff's said lien; that the First National Bank of Minneapolis had a lien upon 22 shares of the stock for $2,300 and interest, as security for a loan of that amount to Thornton, subject to plaintiff's said lien; and that interveners owned the other 20 shares of the stock, subject to plaintiff's lien. The court then ordered the stock to be sold and the proceeds of sale distributed accordingly.

■ The interveners' claim of ownership of all the 62 shares of stock may be conveniently first considered. They allege, in substance, that they and Jessie B. Thornton, the wife of Eric L. Thornton, are the daughters and sole heirs at law of one J. W. C. Dinsmoor, deceased; that the defendant Eric L. Thornton was and is the representative, the administrator, of the estate of J. W. C. Dinsmoor and has handled and managed the property of said estate as trustee for said three heirs; that he purchased the shares of stock in question with the funds of said estate and as trustee for said heirs; that the stock certificates were taken in his individual name for convenience only; that the plaintiff, at the time the stock was purchased and ever since, well knew that Thornton so purchased the stock as trustee for said heirs with trust funds. They accordingly contend that plaintiff has no lien upon the stock and is not entitled to have it sold. Plaintiff denies all claims so made.

The court made findings in favor of the plaintiff. The substance of these findings is that the interveners' claims are not sustained by the evidence and are found not true; that in March, 1909, Eric L. Thornton individually subscribed for $6,000, or 87 shares, of

plaintiff's capital stock, which were issued and delivered to him on November 1, 1909, and of which the 62 shares in question are a part; that he became at that time, and thereafter remained, the owner of said stock; that he paid $68 per share therefor, amounting to $5,916; that the money to pay for said stock was loaned to him, $3,000 by his wife, Jessie B. Thornton, and $2,916 by Viola Dinsmoor Hobson; and that no funds belonging to the estate of J. W. C. Dinsmoor, or belonging to these interveners, were used in paying for said stock; that the stock was not purchased by him as administrator or trustee and no trust funds were used in paying therefor.

If these findings are reasonably sustained by the evidence they dispose of the interveners' appeal. The evidence, both oral and documentary, is voluminous. We cannot so extend an opinion as to recite the evidence here. We are not the triers of the facts and are not required to demonstrate the correctness of the findings. We are limited to the inquiry of whether the evidence and the reasonable inferences that may be drawn therefrom reasonably sustain the findings.

There is no evidence to show that any of the funds of the J. W. C. Dinsmoor estate coming into the hands of Eric L. Thornton as administrator were used in the purchase of the stock. Final account was made and final decree in that matter entered in August, 1909, and there is no reference either in the account or decree to any such stock or stock purchase. But the administrator was never formally discharged, and there is evidence tending to show that at the time he was appointed as administrator in January, 1909, and continuing thereafter at least up to 1926, Eric L. Thornton managed and controlled the individual property of each of the three heirs of Dinsmoor, as well as the property coming into his hands as administrator; that he managed and controlled all thereof as one entity or estate and as agent or trustee for the three heirs; that when Mrs. Thornton and Mrs. Hobson furnished the money to purchase the stock in question they intended to furnish it for the use of this general estate and not for Thornton; that Thornton made two re-

ports to the interveners, one in 1914 and one in 1926, wherein he reported 87 shares of this stock as held by him as part of the general estate. The evidence shows that, in 1920, 25 shares of the capital stock of plaintiff were transferred and reissued to Mrs. Thornton. The stock book of the plaintiff shows that this stock was transferred to her from one Harry B. Thornton. It further shows that then, or some years thereafter, 25 shares of the original 87 shares issued to Eric L. Thornton were sold and transferred to R. E. Alsaker, plaintiff's manager. The evidence does not show that Mrs. Thornton paid anything for the stock issued to her in 1920, unless we infer that it was caused to be issued to her by her husband, Eric L. Thornton, in repayment in whole or in part for the $3,000 furnished by her in 1909. As Mrs. Thornton is not a party to this suit, the court made no finding in reference to this issue of stock to her.

While the evidence we have referred to might have justified the court in finding that the interveners, as between them and Eric L. Thornton, were the equitable owners of the remaining 62 shares of stock, it is not conclusive. Some of the evidence tending to sustain the findings made is that Eric L. Thornton subscribed for the stock in his individual name and that it was so issued to him and thereafter kept in his possession; that he claimed and exercised personally all rights of a stockholder; that on the strength of his ownership of this stock he was personally elected as a director of the corporation and so remained up to and including 1926 and was president of the corporation for two years; that he voted this stock regularly as his personal stock all these years; that he sold 25 shares of the stock without accounting therefor; that he pledged other stock for his personal debts and in all respects treated and used the stock as his personal property for more than 17 years; and that during all that time, so far as appears, the interveners made no claim of ownership either to plaintiff or to anyone concerned.

Without going more into detail, we hold that the findings of the court, to which we have referred, are sufficiently sustained by the evidence.

■ Before the commencement of the action, but apparently after plaintiff's lien rights had accrued, Eric L. Thornton assigned and delivered the certificates for 20 shares of the stock, not previously sold or pledged by him, to the interveners. As this transfer, in any event, was not brought to the notice of plaintiff until after its lien rights had accrued, the interveners cannot thereby defeat plaintiff's lien on these 20 shares. G. S. 1923 (2 Mason, 1927) § 7463; Benson v. Saffert-Gugisberg C. C. Co. 161 Minn. 269, 201 N. W. 424; Geo. A. Hormel Co. v. First Nat. Bank, 171 Minn. 65, 212 N. W. 738.

■ If, as we have held, the evidence sustains the court's findings, that the interveners did not own or have any interest in the shares of stock in question except such as they received by the assignment and delivery to them of the 20 shares by Eric L. Thornton shortly before the action was commenced, then the question of notice or want of notice to plaintiff of their claim or interest need not be determined.

■ The defendants Central Trust Company and First National Bank acquired the certificates of stock held by them as pledges for money loaned by them to Eric L. Thornton personally. The trust company has foreclosed its pledge and obtained title by foreclosure sale.

One remaining question to be considered is common to all the appeals. Of plaintiff's claim, $5,200 is for money loaned by it to Eric L. Thornton.

Plaintiff corporation was organized for the purposes of "buying, owning, and selling lumber, fuel * * * and other articles usually handled by a retail lumber company. To own, hold, lease, and sell real estate and generally to do all things necessary for carrying on said business and for these purposes to possess and employ all the rights, benefits, privileges and immunities incident to, and given under the laws of this state to a corporation of this character."

The articles of incorporation do not expressly authorize the corporation to loan money. Therefore it is claimed the loaning of $5,200 to Thornton was ultra vires and void and that the plaintiff

can have no right to any lien for the money so loaned. There is some argument based on the fact that the corporation or its officers had to borrow $5,000 from a bank before they could loan it to Thornton. That does not appear to be material. It is undisputed that Thornton borrowed that amount from plaintiff, no matter where plaintiff obtained the money.

While it has been stated that as a general rule a corporation has no power to loan its money unless authorized so to do by its charter, the power so to do need not necessarily be expressly given by charter. Neither plaintiff's charter nor the law under which it is incorporated contains any provision prohibiting plaintiff from loaning its money. There is not much difference between loaning money and selling goods on credit, a power undoubtedly possessed by plaintiff. In either case credit is extended. If plaintiff had money on hand, might it not deposit such money in a bank on time certificates so as to receive interest thereon, a loan of money to the bank? We are not prepared to say that a loan of money by plaintiff to an individual or a bank is clearly ultra vires.

Contracts should not be held ultra vires unless clearly shown so to be. 2 Dunnell, Minn. Dig. (2 ed.) § 2025; Dana & White v. Bank of St. Paul, 4 Minn. 291 (385).

The present tendency is to restrict the defense of ultra vires in actions between private parties as far as possible, if not to deny it altogether, except in the case of contracts wholly executory. The general rule is that such contracts are unenforceable when wholly executory, but, when executed on one side, they are enforceable, because the public policy of justice overbalances the public policy of keeping the corporation within the limits of its charter. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 2026; Bell v. Kirkland, 102 Minn. 213, 113 N. W. 271, 13 L.R.A.(N.S.) 793, 120 A. S. R. 621; City of Marshall v. Kalman, 153 Minn. 320, 190 N. W. 597; State ex rel. Hilton v. Mortgage Sec. Co. 154 Minn. 453, 192 N. W. 348.

An ultra vires contract, fully performed on one side, is enforceable either in favor of or against a corporation, unless expressly prohibited by statute. In other words, if a corporation receives

from an individual a substantial benefit under such a contract, it cannot repudiate the contract without restoring the benefit received. On the other hand, if an individual receives money or property from a corporation under such a contract, he or those claiming under him cannot repudiate the contract without restoring what was received. While this rule is generally said to be based on estoppel, it is equally sustained by the equity rule, that one person or party shall not be permitted unjustly to enrich himself at the expense of another. 2 Morawetz, Private Corp. (2 ed.) § 689; M. & L. R. R. Co. v. Dow (C. C.) 19 F. 388; Towers E. & G. Co. v. Inman, 96 Ga. 506, 23 S. E. 418; Dewey v. T. A. A. & N. M. Ry. Co. 91 Mich. 351, 362, 51 N. W. 1063; City of Goodland v. Bank of Darlington, 74 Mo. App. 365, 371. Other cases base the rule on the ground that the ends of justice require such holding. City of Keokuk v. Fort Wayne Elec. Co. 90 Iowa, 67, 57 N. W. 689; Auerbach v. LeSueur Mill Co. 28 Minn. 291, 9 N. W. 799, 800, 41 Am. R. 285. In the case last cited, where the corporation had received and appropriated money for the full amount of a note given by it therefor and defended on the ground that the transaction was ultra vires, the court said [28 Minn. 297]:

"The ends of justice may require, as in this case, that the corporation which has exceeded its powers should be estopped by its own acts from pleading, in defense of its assumed obligations, that they were ultra vires."

The same statement is made in Hunt v. Hauser Malting Co. 90 Minn. 282, 96 N. W. 85.

In Central B. & L. Assn. v. Lampson, 60 Minn. 422, 62 N. W. 544, defendants had received from the association a loan of $2,500 and attempted to defeat recovery on the ground that the transaction was ultra vires. The court said the contract had been fully executed by plaintiff, and that on the plainest principles of justice the defendants were estopped from urging the plea of ultra vires.

In Seymour v. Chicago G. F. L. Society, 54 Minn. 147, 149, 55 N. W. 907, the court said that the contract sued upon was ultra vires.

"But there are few rules better settled or more strongly supported by authorities, with fewer exceptions, in this country, than that when a contract by a private corporation, which is otherwise unobjectionable, has been performed on one side, the party which has received and retained the benefits of such performance shall not be permitted to evade performance on the ground that the contract was in excess of the purpose for which the corporation was created."

In Marin v. Calmenson, 158 Minn. 282, 286, 197 N. W. 262, 263, the court said:

"Having actually received $31,000 from the bondholders, the company could not escape liability on its obligation on a plea of ultra vires, without returning the money."

Davis v. National Cas. Co. 115 Minn. 125, 131 N. W. 1013, and Northland Produce Co. v. Stephens, 116 Minn. 23, 133 N. W. 93, state the same rule.

The courts of some of the states follow other rules, but this and a number of states abide by the rule laid down in the Seymour case, 54 Minn. 147, 55 N. W. 907, above quoted.

■ Defendants urge the distinction between acts ultra vires in a primary sense, being beyond the power of the corporation, and acts ultra vires in the secondary sense, being unauthorized because not done in compliance with law, or with charter provisions regulating the exercise of such powers. Our decisions do not hold that this distinction prevents application of the rule of liability we have been considering.

Defendant Eric L. Thornton could not evade his obligation to plaintiff by a plea of ultra vires, and the interveners and defendants claiming through him are in no better position. Certificates of shares of corporate stock are not negotiable instruments.

■ Defendants cite Prince Inv. Co. v. St. Paul & S. C. L. Co. 68 Minn. 121, 70 N. W. 1079, and St. Paul Nat. Bank v. Life Ins. C. Co. 71 Minn. 123, 73 N. W. 713, as sustaining the proposition that if, before a stockholder incurs any indebtedness to it, the corporation has notice that the stock has been transferred to a third

party, or that such third party has acquired rights in the stock, then the corporation cannot, after such notice, acquire any lien on the stock as against such third party.

The later case of Geo. A. Hormel Co. v. First Nat. Bank, 171 Minn. 65, 212 N. W. 738, indicates that the holding in the two prior cases cited is not to be followed. The later case holds that unless the corporation has waived or surrendered its lien or estopped itself from asserting it, the lien is valid and superior to the rights of any purchaser or pledgee of the stock who has not presented his stock certificates to the corporation and had the transfer recorded on its books or new certificates issued to him showing his ownership or lien, before the indebtedness of the record holder thereof to the corporation accrued. G. S. 1923 (2 Mason, 1927) § 7463, so provides.

In our present case neither the interveners nor the other two appellants had given the plaintiff any notice of the transfer to them of the stock, and none of them had presented their certificates to the plaintiff to have the transfer thereof recorded on its books, or to have new certificates issued, until after the indebtedness for which plaintiff claims a lien was incurred. The Hormel case, 171 Minn. 65, 212 N. W. 738, applies.

The defendants cite G. S. 1923 (2 Mason, 1927) § 7489, providing punishment for diverting corporate property to other objects than those provided in its articles of incorporation where injury to any individual results therefrom. They then argue that the loan by plaintiff to Eric L. Thornton was such a diversion of corporate property and that they suffered injury thereby. The law is one creating a crime and to be so construed. The reasonable construction is that the legislative intent was to conserve the property of the corporation and prevent loss to its stockholders and creditors. If applied as urged by defendants, it would result in a loss of $5,200 to the corporation and its stockholders by preventing the corporation from collecting its claim against Thornton. It would reduce to that extent also the assets of the corporation on which creditors might rely in dealing with it. We cannot hold that de-

fendants come within this statute under the circumstances here shown.

The same question was presented in Erb v. Yoerg, 64 Minn. 463, 67 N. W. 355, 356. The court did not find it necessary to consider whether the statute had any application to the case. In deciding the case the court said [64 Minn. 465]:

"Conceding that the contract of purchase in this case was ultra vires, and, while executory on both sides, void, still, as the tobacco works retained the goods purchased, it was estopped from denying its liability to pay for them."

Counsel cite Bryan County State Bank v. American Nat. Bank, 56 Okl. 529, 156 P. 352, and Lanier Lbr. Co. v. Rees, 103 Ala. 622, 16 So. 637, 49 A. S. R. 57. Neither case is specially applicable to the facts in our present case. So far as applicable, they are holdings by courts who differ from this court as to the effect of ultra vires on contracts fully executed by one of the parties.

There are voluminous assignments of error covering practically all findings of fact and conclusions of law made by the trial court. We have determined the decisive questions presented and need not specifically refer to other assignments.

Errors are also assigned upon several rulings of the court on evidence. We find no reversible errors in that respect.

Each of the three orders appealed from is affirmed.