HEDGES et al. v. SIGNAL AMUSEMENT CO. et al.

Eastern Section.   May 30, 1933.

Petition for Certiorari denied by Supreme Court, November 18, 1933.

362

Sizer, Chambliss & Kefauver, of Chattanooga, for appellants.

Charles C. Moore and Shepherd, Carden, Curry & Levine, all of Chattanooga, for appellees.

PORTRUM, J. This suit was filed by the trustee of the lessor to recover two monthly installments of rent aggregating $2,500, and past-due taxes, covered in the lease, of $5,259.83, or the total sum of $7,759.83, from the defendants, the lessees, Signal Amusement Company, a Tennessee corporation, the Tennessee Enterprises, Inc., a Delaware corporation, domesticated and doing business in Tennessee, and certain of the officers and stockholders of the Signal Amusement Company. The suit against the defendants other than the Signal Amusement Company is predicated upon the liability arising since the execution of the lease, due to their course of deal'ng with the amusement company.

The bill also prays for a declaration fixing liability on the defendant to respond ''for the further performance of the obligations'' arising under the lease. The lease expires in 1950, and the rentals at the rate of $1,250 per month reflect a substantial liability.

All of the defendants plead and assert that the contract is void because ultra vires and not enforceable in a court of equity; and the defendants, with the exception of the lessee, advance other defenses.

The chancellor was of the opinion that the Signal Amusement Company, organized for amusement enterprises, had been engaged in carrying on a speculative real estate business, by taking long-term leases with the expectation that rental values would increase, and the leases would yield a substantial profit to the lessee by reason of the increase in value. He found as a fact that the lease in question was taken by the Signal Amusement Company for this purpose, and that this purpose was beyond the powers of the corporation. This was the purpose of the lessee, but it is not shown that the lessor was apprised of this purpose by the lessee. We quote from the chancellor's finding:

''It had also assumed to engage extensively in the business of acquiring long-term leases on real estate, with no intention of using it for theatre or amusement purposes, but for the express purpose of subleasing it for business purposes. In 1920, it was the lessee in seven such leases, including the one now in suit on property on Market Street in Chattanooga, and one on Gay Street in Knoxville. These will be referred to as its business property.''

Because of business difficulties and financial obligations which confronted the company in 1920, it transferred all of its amusement

property and retained only its business property. Thereafter, quoting again from the chancellor:

"Its only business consisted of subleasing these properties and collecting and disbursing the rentals and now and then disposing of a lease. And, in 1929, having disposed of all its leases, except the one in suit and one other, it surrendered its charter."

From the chancellor's decree the complainants appealed, and their first assignment of error reads:

"The Chancellor erred in holding and adjudging that the Signal had no power to enter into the lease contract sued on."

In connection with the first assignment of error, we quote the second assignment:

"II. The Chancellor erred in holding and adjudging that the Signal and its officers and stockholders could assert the lack of power of Signal to take the leases in question as defense against an action thereon."

Did the company have power to acquire the lease, and if not, can the defendants advance this lack of power as a defense?

We quote the pertinent charter provision:

"Be it enacted, that . . . (incorporators) . . . are hereby constituted a body politic and corporate by the name and style of the Signal Amusement Company, for the purpose of erecting amusement enterprises in all the branches pertaining thereto and thereof; to buy, lease, option, or otherwise acquire, hold, exchange, sell or otherwise dispose of and deal in real estate of buildings for the erection of and establishment of theatres, or opera houses; to erect or furnish a building or buildings for use and occupation as an opera house or houses, or theatre or theatres; and to conduct and operate the same. . . .

"The general powers of the corporation are:

"To purchase and hold, or receive by gift, in additional to the personal property owned by said corporation, any real estate necessary for the transaction of the corporate's business, and also to purchase or accept any real estate in payment or part payment of any debt due to the corporation, and sell realty for corporate purposes. . . .

"By no implication or construction shall the corporation be deemed to possess any powers except those hereby expressly given or necessarily implied from the nature of the business for which the charter is granted, and by no inference whatever shall said corporation possess the power to discount notes or bills, deal in gold or silver coins, issue any evidence of debts or currency, buy and sell any agricultural products, deal in merchandise, or engage in any business outside the purpose of the charter."

We next quote the pertinent provisions of the lease:

"This Indenture, made this the 22nd day of May, 1920, between James R. Hedges and American Trust & Banking Company, Trus-

tees, parties of the first part, and the Signal Amusement Company, party of the second part;

"Witnesseth, that the parties of the first part hereby lease to the party of the second part the following premises, in Hamilton County, Tennessee, to-wit: A store room situated on the east side of Market Street between Sixth and Seventh Streets in the City of Chattanooga, Tennessee, and occupied by the Piggly-Wiggly Store, Walton & Company, and the Evans Hughes Shoe Company, and comprising the entire ground and improvements lying between the property of George K. Brown and R. H. Paris; subject always to the terms and conditions written upon the back hereof for the space of thirty years from the first day of July, 1920, and covenants to keep the tenants in quiet possession of the premises during said term.

"It is hereby expressly agreed to, and understood by the said parties, that the said property is to be used as herewith described, and not otherwise, viz., for any lawful and legitimate business purposes.

"In consideration whereof, The party of the second part binds itself to pay for the same $1250, on the first day of each and every calendar month in advance, being at the rate of $15,000 per annum, and to keep all the improvements upon the property in first-class repair, and to maintain fire insurance upon the same for the use of the lessors in an amount not less than $30,000, all at their own expense, and pay all taxes and assessments of every kind against the property, and to be responsible for all damages sustained or claimed in connection with the property during the term of this lease, and to take good care of the premises, and return the same at the expiration of the said time in as good order as received, ordinary wear and tear and natural decay excepted, unless destroyed by lightning or other natural causes, or fire not caused by its default; and not to erect, or to permit to be erected on the premises, any nuisance or commit waste.

" . . . 12. The lessee shall not undertake any alteration or repairs on the premises without the written consent of the lessors.

"In testimony whereof . . ."

We quote some of the stipulations appearing upon the back of the lease.

"First: The party of the second part assumes, takes over, and will carry out the existing lease to the Piggly-Wiggly Store at a rental of $250 per month, expiring November 1, 1924, which rent it will receive.

"Second: The party of the second part agrees to lease the premises now occupied by the Evans Hughes Shoe Company to that company for a period of two years from July 1, 1920, at a monthly rental of $350 per month, should said company desire to make such a lease.

"Third: The party of the second part agrees to lease the two entire buildings known as Nos. 606, 606½, 608 and 608½ Market Street to Walton & Company for a period of two years from the first day of

July, 1920, at a monthly rental of $700 per month, should said company desire to make such a lease, which rent said party of the second part shall receive.   .   .   .

"Fifth: The party of the second part shall have the right, at its own expense, to make any improvements or alterations upon the property which may be approved in writing by the parties of the first part, that such improvements or alterations shall when made become a part of the fee and shall belong to the parties of the first part, without compensation to party of the second part, at the expiration of the lease.   .   .   ."

As identifying the house numbers with the property described in the main part of the lease, we refer to the description under the title as follows:

"Premises.   604, 606, 608, 610 Market Street, Chattanooga, Tennessee."

The charter restricts the acquisition of real estate except for use and occupancy as a theatre or opera house, and by no implication or construction shall the corporation be deemed to possess any powers except those expressly given or necessarily implied from the nature of the business for which the charter is granted, and expressly prohibits the company from engaging in any business outside of the purposes of the charter. And the lease provides the property may "be used as herewith described, and not otherwise, viz., for any lawful and legitimate business purposes." Certainly the company had no power to lease and use this property for "any lawful and legitimate business purposes." But it is said that an amusement enterprise is a lawful and legitimate business purpose, and the property could have been used for this purpose, and the lease is not void because it granted powers, and rights, in excess of those possessed by the corporation. That the building was so situated that it could have been used as a theater, or an opera house; and the lessor had the right to assume that the property would be used by the lessee in a lawful and legitimate amusement purpose.

The facts show the property could not be used as a theater, or for amusement enterprises, without alterations and improvements; and before the lessee could make these alterations and improvements it was necessary that it have the written consent of the lessor. This fact is reflected by the use of the property as described in the lease at the time of its execution. Therefore, before this property could be used for amusement enterprises, it was necessary that the lessor's written consent to the improvements and alterations should be made, and this provision is equivalent to a supplemental agreement, or the making of another contract. It may be assumed that the lessor would have granted this permission, but a supplemental agreement was necessary before the lessee could use this property for amusement purposes. Until the supplemental agreement was made this

lease was void because the rights granted under it were not within the power granted the corporation by its charter.

We think these quoted provisions answer the argument that only the state can plead and assert the defense of ultra vires, because the lease is void upon its face; the powers granted are shown by the lease to be in excess of those enjoyed by the corporation. Had this been a lease without restriction, then the lessor could have assumed it was acquired for corporate purposes, since the charter permitted the acquisition of real estate, and then only the state could have called into question the abuse of power by the corporation.

In case of Miller v. Insurance Co., 92 Tenn., 167, 21 S. W., 39, 42, 20 L. R. A., 765, the court, speaking through Judge Lurton, says, after laying down the rule that those who deal with the corporation are bound to take notice of the limitations contained within the law of its creation:

"But where an act or contract is within the apparent scope of its charter, and the defect in power depends upon some extrinsic fact peculiarly within the knowledge of the officers and agents of the corporation, and is unknown to the persons so dealing, then there is no presumption of a participation in doing the illegal act, and a different rule of responsibility applies from that enforced where the defect is apparent upon a comparison of the contract with the charter."

In the case Farmers' National Bank v. Sutton Manufacturing Company, 52 Fed., 191, 195, 17 L. R. A., 595, Judge Ferris, speaking for the Circuit Court of Appeals for the Sixth Circuit, says:

"Every one dealing with a corporation is charged with notice of its corporate powers. If, therefore, a reference to the charter shows a seeming act of the corporation to be beyond its powers, it is void, and cannot be made the basis of any claim of liability against the corporation. But there are acts that may or may not be within the charter powers, their lawful character being dependent on the existence of a fact which cannot be known from the act itself. If the extrinsic fact upon which depends the lawful character of the act is one peculiarly within the knowledge of the general agent of the corporation by whom the act is done, the act itself is an implied representation that the necessary fact exists, the truth of which the corporation is estopped to deny against any person who is dealing with the corporation has parted with value on the faith of it."

Since the defects in this case are apparent upon a comparison of the contract and the charter, the rule announced in these two cases may appear inapplicable, for it is stated: "Every one dealing with a corporation is charged with notice of its corporate powers. If, therefore, a reference to the charter shows a seeming act of the corporation to be beyond its powers, it is void, and cannot be made the basis of any claim of liability against the corporation." If it cannot

be made the basis of any claim, then any one who is sued can assert the unlawful act.

Courts under the facts of many cases have applied the rule that where the contract is executed, then the. courts will not entertain a plea of ultra vires; in such cases some one with notice of the charter liminations would have to appeal to the courts for relief, and the courts will not entertain the suit. But we are not confronted with an executed contract; the lease did not expire until 1950. Mallory v. Oil-Works, 86 Tenn., 598, 8 S. W., 396.

This is the fourth assignment:

"The Chancellor erred in failing and refusing to hold that Signal, having taken possession of the leased property and held it and received the rents and profits of it for more than ten years, could not deny liability for the obligations which it assumed by the contract during the time that it held the leased property thereunder."

This principle is well established and recognized by all the courts; but the chancellor is not chargeable with error, since he recognized the principle and applied it. This rule is sometimes based upon an estoppel, for a court of equity will not permit one person to unjustly enrich himself at the expense of another. Benson Lumber Co. v. Thornton, 185 Minn., 230, 240 N. W., 651, 81 A. L. R., 981. Other courts apply the maxim that "he who seeks equity must do equity," and that one may not at the same time accept the benefits and repudiate the burden of the contract. Sioux City, etc., Co. v. Trust Co. (C. C. A.), 82 Fed., 124. The Supreme Court of Tennessee says it is immaterial whether it be considered that the ultra vires contract is void when an implied contract arises by law or whether it be considered that the corporation is estopped to plead ultra vires. Tenn. Ice Co. v. Raine, 107 Tenn., 151, 64 S. W., 29, and Dillard, etc., Co. v. Cotton Oil Co., 140 Tenn., 290, 204 S. W., 758.

The application of any of these maxims reaches the same end, which is to prevent either of the parties profiting from an illegal contract, and to restore to the injured party that which his adversary has gained under the contract. If we apply an estoppel, then we should be governed by the rules applicable to an estoppel. We should not require the party to do more than equity, especially when to do so unjustly enriches his adversary. In disposing of this issue the chancellor says:

"In this suit, the Amusement Company, holding under a contract which it must now be held it had no power to make, and which, for this reason, cannot be enforced, has received benefit in the shape of rentals for more than eleven years. Assuming that the prayer for general relief permits, the complainants are entitled to an accounting. But, on this record, would such an accounting result in the recovery in their favor? I think not.

"The Amusement Company would have to account for the value of the benefits it received. These benefits consisted of the rentals it

received. There is no allegation that it did not receive all the rents which the property was capable of producing. Hence what is actually received must be taken as conclusive evidence of the rental value or the amount for which it must account. But it would, of course, be entitled to credit for what it has paid. And it clearly appears that it has paid more than it can be held accountable for.

"The bill alleges that the lease turned out to be a liability instead of an asset since the rentals received were always less than the payments required to be made. And the undisputed evidence is that, during the entire time, the excess required payments over rentals received was about $200 per month. It follows that if all payments had been made from July 1, 1920, to November 1, 1931, a period of one hundred and thirty-seven months, they would have exceeded rentals received by $27,400. In fact, all these payments were made except the rentals for two months and the taxes for one year, amounting to $7,759.83. Thus the complainants have actually received nearly $20,000 more than all the rentals. In other words, they have suffered no loss from the Amusement Company's repudiation of an ultra vires contract. On the contrary, it is nearly $20,000 better off than it would have been if it had had the use of this property."

We think the chancellor correctly applied this principle, and that the complainants are not entitled to be further enriched.

"The Chancellor erred in failing and refusing to hold that Wilkerson and associates and Tennessee, as purchasers of the stock of Signal, are liable on the lease sued on, even if Signal as a corporation was not bound thereon.

"(a) The stockholders of a corporation are estopped to deny the liability of a transaction with the corporation on the ground of ultra vires where the corporation has received the benefit of the transaction, or the stockholders have authorized it or participated in it, or have ratified and acquiesced in it; so also an officer of a corporation who takes part in a corporate transaction and thereby asserts that the corporation has the power to enter into it, is estopped from denying its liability."

This contention is beyond the scope of the pleadings, if not contradictive to the pleadings; the bill did not seek to hold the defendants personally liable upon this theory, and in the absence of pleadings it is unavailable.

There are many other assignments of error, both by the appellants and the appellees, but they are predicated upon the assumption that the defense of ultra vires is not available to the defendants, and the chancellor did not find it necessary to pass upon the questions. He did not err in failing to pass upon these questions, since the question he passed upon is conclusive. All the assignments of error are overruled, and the judgment of the lower court affirmed, with costs.

Snodgrass and Thompson, JJ., concur.