## MILLER *v.* INSURANCE COMPANY.

### (*Nashville.* January 26, 1893.)

1. INSURANCE, ACCIDENT. *What injuries are covered by policy.*

    An accident policy that insures the holder "against external bodily injuries effected through external violent and accidental means," covers an injury by gunshot through the wrist, sustained by insured while cleaning a shotgun, handling it in the usual manner for that purpose, and believing it unloaded, but which, being loaded, was discharged unintentionally in handling, by reason of a defect in its lock, which was unknown to assured. (*Post, pp. 169–172.*)

2. SAME. *What is not voluntary exposure to danger.*

    And the injury, in such case, does not fall within that clause of the policy which exempts the insurer from liability where the assured's injury results "from voluntary exposure to unnecessary danger." (*Post, pp. 186, 187.*)

3. SAME. *Charter powers defined.*

    An accident insurance company, limited by the express terms of its charter to insurance of persons against accidents sustained "*in* traveling," is not liable for an injury such as that sustained by the plaintiff in this case, although the language of the policy is sufficiently comprehensive to embrace it. Insurance against such injury by such company is *ultra vires* and void. (*Post, pp. 172–174.*)

4. SAME. *Same.*

    But an accident insurance company authorized by its charter "to make insurance against *disabilities* to persons by sickness or disease, or *other bodily infirmities*," is liable upon its policy for an injury such as the plaintiff in this case sustained. (*Post, pp. 173–175.*)

5. CORPORATIONS, PRIVATE. *Defense of ultra vires available, when.*

    Contracts of corporations made in excess of their charter powers are *ultra vires* and void. Such contracts are in contravention of public policy. And corporations are not estopped, although the contract

Miller *v.* Insurance Company.

has been executed in good faith by the other party, to make the defense of *ultra vires* to any suit brought to enforce such unauthorized contract. (*Post, pp. 174–177.*)

Cases cited and approved: Marble Co. *v.* Harvey, *ante*, p. 115; Elevator Co. *v.* Railroad, 85 Tenn., 705; Mallory *v.* Oil Works, 86 Tenn., 598; 22 N. Y., 285; 131 U. S., 389; 139 U. S., 60; 131 Mass., 258; 65 Ala., 448; 54 Ala., 471.

6. SAME. *Amendment of charters. Constitutional powers.*

Charters issued under the general incorporation Act of 1875 may be amended by general laws *adding* to the powers therein originally granted. Such amendments are authorized by the Constitution. It is not material whether the power to make them was reserved in the original Act. (*Post, pp. 172, 173.*)

Constitution construed: Art. XI., Sec. 8.

Acts construed: Acts 1875, Ch. 142; Acts 1889, Ch. —.

7. SAME. *Same. Estopped to deny acceptance of.*

Corporations are required by the general incorporation Act of 1875 to accept, by a prescribed method, amendments to their charters proposed by subsequent statutes, or, in default thereof, to wind up their affairs. A corporation remaining in business after the passage of a statute proposing a fundamental amendment to its charter, and exercising the additional powers conferred by the amendment, will be conclusively presumed to have regularly accepted the amendment, and will be estopped to deny acceptance thereof by the prescribed method, as to those who have dealt with the corporation in a matter within the scope of the amendment, believing that such acceptance had taken place in due form. (*Post, pp. 177–185.*)

Acts construed: Acts 1875, Ch. 142, Sec. 5; Acts 1889, Ch. —.

Cases cited and approved: Nelson *v.* Haywood County, 87 Tenn., 781; Merriman *v.* Magiveny, 12 Heis., 497; 92 U. S., 484; 19 N. Y., 482; 26 N. Y., 75; 61 Ala., 465; 83 Ala., 118.

8. SAME. *Same. Nature of amendments proposed.*

The Court does not decide whether the amendment of charter proposed in this case is fundamental, requiring, under Acts 1875, unanimous acceptance by stockholders, or merely auxiliary, and therefore not requiring acceptance in that manner. But the Court declares it "to be the sounder rule that only very material amendments, radical and vital in their character, should be regarded as requiring unanimous adoption;" and that an amendment should not be deemed funda-

mental that does not change the character of the business, and simply authorizes its extension upon the lines of the original project. (*Post,. pp. 185, 186.*)

Case cited and approved: 18 N. J. Eq., 185.

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County.  W. K. McAlister, J.

West & Burney for Miller.

Baxter & Hutcheson for Insurance Company.

Lurton, C. J.  This case was heard by the Circuit Judge, without a jury, upon the following agreed statement of facts:

"On the eleventh day of February, 1890, the defendant issued an accident insurance policy to complainant, the original of which is hereto attached, marked 'Exhibit A,' and is the policy mentioned in the declaration. On the third day of April, 1890, plaintiff, with others, went snipe-hunting in the country near 'Clarksville, Tenn., plaintiff using a gun which was the property of W. P. Lawrence's father.  Coming home in the evening, he placed the gun in the office of the Arlington Hotel, back of the clerk's desk.

"On Saturday, April 5, Miller left his home about eight o'clock A.M., went direct to the hotel, found the gun where he had left it, and prepared to clean the gun, which was a breech-loading shotgun, in order to return it to Dr. Lawrence.

"He went into the billiard-room of the hotel, and procured a piece of billiard-cloth; went into the next house, which was then occupied as an office by L. A. Ragsdale, and also by Miller. There was no one present but W. D. Sheldon, the bookkeeper of Ragsdale. Miller seated himself on a sofa, with his left side toward the door, with Sheldon near and in front of him. Miller began to clean the gun, which rested on his legs between his knees and hips, while Sheldon read an account of the floods in Mississippi. The muzzle of the gun was to his left side. While rubbing the gun with the cloth in his left hand it was suddenly discharged, the entire load of shot passing through his left wrist, which necessitated the immediate amputation of his arm between the elbow and wrist, which amputation was performed that day by Dr. Lawrence.

"Miller states positively that he did not know the gun was loaded, and that he does not know who placed the cartridge in the gun. He was perfectly sober. He afterwards learned, on examining the gun, that one barrel was very easy on the trigger, and the hammer could be thrown by striking the butt on the floor. This defect was remedied by a gunsmith some time afterwards.

"He denies positively that he purposely discharged the gun, but claims it was purely an accidental discharge. He gave notice and made proofs of loss, as required by said association, which were receipted for by the defendant. All dues had been paid.

"The defendant, in 1887, procured and had properly executed, etc., a charter, of which 'Exhibit B,' attached hereto, is agreed to be an exact copy. It organized under same, and solicited business and issued policies of insurance against accidents up to and after April, 1890, using the form, 'Exhibit A,' in their business, and said association undertook to do no other kind of business. It paid many losses on account of accidents, but has paid plaintiff nothing on account of his injury. It is agreed that Miller had no *actual* knowledge of want of power in defendant to issue, and insure, as provided by said policies, if such want of power exists.

"It is admitted that said association took no action either to accept or reject the amendment passed by the Legislature in 1889, to charters for insurance companies. See Acts of 1889, Ch. 224, p. 445.

"Miller lives in Clarksville, Tennessee, where the accident happened."

The Circuit Judge, being of opinion that the contract of insurance, in so far as it undertook to insure against an injury occurring while the assured was not traveling, was beyond the power and au-

thority of the defendant company under its charter,. gave judgment for the defendant.

The policy held by the plaintiff insured him "against external bodily injuries effected through external violent and accidental means." It is clear that, all other questions aside, the contract covers. the injury sustained by him.

The insistence of the defendant is, that under its charter it had no authority to make so broad a contract, and that its power to insure the plaintiff, by its organic law, was limited to insurance against accidents sustained "*in* traveling," and that, inasmuch as he was not injured while traveling, there can be no recovery in his favor.

The defendant corporation was organized in 1887, under the general Act of 1875 providing for the creation of private corporations. The power conferred by that Act upon insurance companies, in regard to insurance against accidental injuries, was limited to insurance against injuries to persons "in traveling." The Constitution of the State provides that "no corporation shall be created or its powers increased or diminished by special laws, but that the General Assembly shall provide by general laws for the organization of all corporations hereafter created, which laws may, at any time, be altered or repealed, and no such alteration or repeal shall interfere with, or divest, rights which have become vested." Art. XI., Sec. 8. The Act of 1875 reserved the right to repeal, annul, or modify all charters obtained thereunder. Without

stopping to criticise the weight of the words contained in this Act, concerning the power to alter a charter by *adding* to the powers therein granted, it is sufficient to say that the power existed under the Constitution, and the Legislature, without regard to the reservation in the Act, had the right to amend any general law concerning the powers of corporations organized thereunder. Acting under its constitutional power, the Legislature of 1889 so amended the Act of 1875, in regard to the power of insurance companies, as to confer upon all such companies theretofore or thereafter organized under that Act, the power " to make insurance against *disabilities* to persons by sickness or disease, or *other bodily infirmities.*" A disability is defined as " a deprivation of ability," " state of being disabled," " incapacity." The power conferred by the amendment was to insure against disabilities, whether such disability resulted from sickness or disease, or from " *other bodily infirmity.*" One who loses a leg or arm or eye, or is otherwise disabled, whether temporarily or permanently, by external and violent means, is one suffering from an imperfection, and is to that extent disabled by a " bodily infirmity." But the defendant company insists that it cannot be held under the amendatory Act of 1889, inasmuch as it has taken no action in regard to this amendment, and that it is such an alteration in its charter as to be a fundamental amendment, and that, under Section 5 of the Act of 1875, such an amendment is inoperative as to it until

it has been submitted at a general stockholders' meeting, and adopted by a majority of its shareholders.

For the plaintiff it is contended in answer to this defense—

1. That the contract has been executed upon his part, and that it would be inequitable and unjust to permit the corporation to rely upon the doctrine of *ultra vires* under such circumstances.

2. That by the issuance of a policy in express terms insuring him against injury by external, violent, and accidental means, without any regard as to whether such injury was sustained "in traveling," that it has assumed to exercise the power conferred by the amendment, and thereby represented to him that it had accepted and adopted the amendment in the manner necessary to obtain the power it had exercised; that it should, therefore, be estopped from showing that it had not in fact adopted the amendment.

3. That if none of these answers be well taken, he then insists that the amendment was not fundamental, but merely auxiliary, and that it was not necessary that such an amendment should be accepted by the voluntary action of the shareholders.

We will consider these matters in the order in which they have been stated.

We recognize a diversity of opinion in the Courts of America as to the right of either party to rely upon the defense of *ultra vires,* when the

contract is not expressly prohibited, and is not immoral, and has been fully executed upon one side. The theory upon which the cases rest which hold that the defense is not to be entertained when the act is one merely in excess of express authority, seems to be that such a contract should be regarded as a mere breach of duty by the agents of the corporation, and that the State has ample remedy for such abuse, or for a usurpation of power, in a proceeding to annul the charter; that to permit such a defense is of no service to the State in preventing corporate usurpation, or in promoting the public interest, and only operates to encourage dishonesty and promote injustice. Resting upon one, or more of these arguments, many cases might be cited. There are, then, a class of cases which take a distinction between acts merely in excess of authority and those which, in addition, are affirmatively forbidden, or immoral, or in contravention of some principle of public policy.

It seems to us that the true foundation of the doctrine of *ultra vires* lies in the proposition that every act of a corporation in excess of its power is an act in contravention of public policy, and for that reason to be held null and void. The ground upon which corporate privileges are conferred is, that the public interests may be thereby subserved. If this is not so, then all such concessions are mere acts of legislative favoritism, and contravene the foundation upon which free

government is supposed to rest—that all are to be protected in the enjoyment of equal rights and privileges. Charters must be supposed, therefore, to be granted upon the supposition that some public interest is thereby advanced. "The Legislature is, therefore, presumed," says Judge Seldon, in *Bennett* v. *R. R.*, 22 N. Y., 285, "to have granted just so much power and so many peculiar privileges as these interests are supposed to require."

It must be, therefore, that any act in excess of these granted powers is an act contrary to public policy, and, upon that ground, illegal and void. Any other view, by which such acts are to be supported because executed, would operate as an enormous practical extension of the power of corporations. The view this Court has taken has therefore been that, "all acts outside the object of its creation, as defined in the law of its organization, and, therefore, beyond the powers conferred upon it," are acts not voidable only, but wholly void. *Buckeye Marble Co.* v. *Harvey, ante*, p. 115; *Elevator Co.* v. *M. & C. R. R. Co.*, 85 Tenn., 705; *Mallory* v. *Oil Works*, 86 Tenn., 598.

The rule, and the foundation upon which it rests, as held by the English Courts, is identical with our own. The English doctrine is summarized by Mr. Beach in these words: "Corporations are created for fixed purposes, with certain specified powers. It is deemed to be public policy to keep them strictly within bounds so defined. There is an implied prohibition to go beyond such limits,

and all persons dealing with a corporation are charged with notice of the limitations upon its authority. Therefore, every contract of a corporation or its agents, which exceeds the powers of the corporation, violates this implied prohibition, and contravenes such public policy, and is illegal and void. Consequently, as to such contracts, there can be no ratification or estoppel." 2 Beach on Private Corporations, Sec. 421. The Tennessee rule is in accord with the holding of many of the American Courts. *Pittsburg Ry. Co.* v. *Keokuk Bridge Co.*, 131 U. S., 389; *Central Transportation Co.* v. *Pullman Co.*, 139 U. S., 60; *Davis* v. *Old Colony R. R. Co.*, 131 Mass., 258; *Chambers* v. *Falkner*, 65 Ala., 448; *Marion Savings Bank* v. *Dunkin*, 54 Ala., 471.

The remedy, in case one of the parties has received a benefit under such a contract, which, *ex æquo et bono*, it ought not to retain, is a suit in disaffirmance and for an accounting. *Buckeye Marble Co.* v. *Harvey, supra.*

The plaintiff's suit is upon the contract, and in affirmance of it, and, if there be nothing else in the case, could not be maintained.

But is the defendant company, for any reason, estopped to show that this amendment had not been adopted? The provisions of the Act of 1875, concerning legislative amendments of charters obtained under the general law, is in these words: "The right is reserved to repeal, annul, or modify this charter. If it is repealed, or if the amend-

ments proposed, being not merely auxiliary but
fundamental, are rejected by a vote representing
more than half of the stock, the corporation shall
continue to exist, for the purpose of winding up
its affairs, but not to enter upon any new busi-
ness. If the amendments or modifications, being
fundamental, are accepted by the corporation as
aforesaid in a general meeting to be called for
that purpose, any minor, married woman, or other
person under disability, or any stockholder not
agreeing to the acceptance of the modification,
shall cease to be a share-holder, and the corpora-
tion shall be liable to pay said withdrawing stock-
holders the par value of their stock, if it is worth
so much; if not, then so much as may be its
real value in the market on the day of the with-
drawal of said stockholders as aforesaid; *Provided,*
That the claims of all creditors are to be paid in
preference to said withdrawing stockholders." Acts
of 1875, p. 237, Sec. 5.

It is to be observed that the State does not by
this Act undertake to arbitrarily impose a funda-
mental alteration, and require the corporation to
continue in business under the amendment. It
does, however, demand that the corporation shall
accept the amendment, however radical it may be,
or continue its existence only for the purpose of
winding up its business. In other words, the
State says to every corporation to be organized
under this law, "I reserve the right to repeal or
amend this charter at any time. If the amend-

ment I shall propose is vital and fundamental, it shall be submitted to the action of the stockholders. If a majority assent to it, and adopt it, then the corporation may continue in business. If there be any who are incapable of consenting, or any unwilling to accept, then all such share-holders shall cease to be share-holders, and the corporation shall be liable for the market value of all such shares. But if the amendment be unacceptable to a majority, then you shall exist only for the purpose of winding up your business, and shall have no power to enter upon any new contracts."

Under this Act, if the alteration be fundamental, the corporation must do one of two things—accept the offered amendment, or wind up.

The defendant says that it did neither. The law conclusively presumes that every officer, agent, and stockholder of this company knows the general law of the State affecting its powers and its business. The corporation, regarded as an entity, must be taken to have known of the right reserved by the State to amend its charter. This right was written in its very face. It must be taken to have known that the State, by the Act of 1889, had proposed an amendment. It must be taken to have known that it must accept this added power or it must cease to do business. It knew that every such corporation which should thereafter be found engaged in the doing of new business would be regarded by all who dealt with it as having all the powers conferred by the Act of

1875, and the amendment of 1889. An act or contract within the scope of either of these general laws of the State was an act or contract within the apparent scope of the powers of any such company. All who deal with a corporation are bound to take notice of the limitations contained within the law of its creation. Mor. on Corp., Sec. 592; Beach on Corp., Sec. 383. But when an act or contract is within the apparent scope of its charter, and the defect in power depends upon some extrinsic fact peculiarly within the knowledge of the officers and agents of the corporation, and is unknown to the person so dealing, then there is no presumption of a participation in doing the illegal act, and a different rule of responsibility applies from that enforced when the defect is apparent upon a comparison of the contract with the charter. To illustrate:

"If a person deal with an agent of a corporation within the scope of his apparent authority, and without notice of the non-performance of any formality prescribed by the charter or by-laws as a condition precedent to the agent's authority to act, he will be entitled to assume that the formality has been complied with, and the corporation will be estopped from showing that the agent had no authority to bind it by reason of a failure to comply with the prescribed condition." Mor. on Corp., Sec. 610, 686.

Thus, as against *bona fide* holders, a corporation was held estopped to show that its bonds were

invalid because issued, and mortgage executed, under resolutions of a board of directors held in a State other than that in which the corporation dealt. The purchaser of such bonds was held to be under no obligation to examine the minutes of the directory to see where it sat when the mortgage was authorized. *Galveston Railroad* v. *Cowdrey*, 11 Wall., 459.

So, when the power is given to a county to issue bonds upon terms prescribed in the Act, and the duty of determining when the conditions have been complied with is imposed upon certain officers or a·particular Court, and the bonds are afterwards issued, and recite upon their face that these conditions have been complied with, the county is estopped from setting up any irregularities in their issue, and contrary to the recital on the bonds, as between it and an innocent purchaser. *Nelson* v. *Haywood County*, 3 Pickle, 781; *Town of Cohoma* v. *Eaves*, 92 U. S., 484.

The case of the *Royal British Bank* v. *Turquand*, 6 El. & Bl., 327, is in point. The directors, by the charter, called the deed of settlement, were only authorized to borrow money upon obtaining a resolution at a general meeting of the company. The directors having borrowed, without such a resolution, from one who loaned in good faith, on suit, the bank was held liable.

Jervis, C. J., said: " We may take it for granted that the dealings with these companies are not like dealings with other partnerships, and that the par-

ties dealing with them are bound to read the statute and the deed of settlement. But they are not bound to do more; and the party here, on reading the deed of settlement, would find, not a prohibition from borrowing, but a permission to do so on certain conditions. Finding that the authority might be made complete by a resolution, he would have a right to infer the fact of a resolution authorizing that which on the face of the document appeared to be legitimately done."

To the same effect is the case *In re* County Life Ass. Co., L. R., 5 Ch. App., 293. In that case Gifford, L. J., said: "A stranger must be taken to have read the general Act under which the company is incorporated, and also to have read the articles of association; but he is not to be taken to have read any thing more, and, if he knows nothing to the contrary, he has a right to assume, as against the company, that all matters of internal management have been duly complied with."

The well-known general rule applicable to one dealing with a company purporting to be a corporation seems to be applicable where the inquiry is as to whether an amendment has or has not been accepted, and the company, by acts of user, has represented itself as having the power conferred by the amendment. That rule is, that as against all persons who have entered into contracts with bodies assuming to act in a corporate capacity, it is sufficient for such bodies to show themselves to be corporations *de facto*.

This Court, in *Merriman* v. *Magiveny*, 12 Heis.' 497, said, " that in a proceeding between such corporations and an individual who has dealt with it, irregularities in its organization which might give the State the right to proceed by *quo warranto*, or other like proceeding, to have the charter declared void, cannot be taken advantage of." See, to same effect, 19 N. Y., 482, and 26 N. Y., 75.

So in Alabama, where the rule concerning the defense of *ultra vires* is identical with our own, it has been held that " if one contract with a corporation in a matter within its corporate power, the mere making of the contract estops the promisor from disputing the corporation's regular and complete organization." *Lehmon* v. *Warner*, 61 Ala., 465. In the later case of *Sherwood* v. *Alvis*, 83 Ala., 118, Stone, C. J., said: " The distinction is between the entire absence of authority in the organic law itself and a failure to comply with some prerequisite which the law has made a condition precedent to the exercise of corporate functions. In the one case there is a want of power, and in the other only an abuse of power conferred."

Let us apply this principle to the case in hand. One dealing with this corporation is bound to take notice of the statute and its amendments under which it was doing business. He was not bound to go any further. When he found this company engaging in new business after the amendment of its charter under the Act of 1889, he was bound

to look to the limitations upon its powers contained in this amendment; for, finding it using the powers therein conferred, he had a right to presume that its stockholders had adopted this amendment. The question as to whether a stockholders' meeting had been held, and whether a majority of the stock had been voted for the amendment, were questions of internal management peculiarly within the knowledge of its officers and agents, and as to which it is conceded he had no knowledge. The making of the contract involved was a representation, as was the fact of its continuance in business, by these officers and agents that such a meeting had been held, and that a majority of the stock had accepted the offered power necessary to justify the making of the contract.

"If a portion of the share-holders undertake to accept a new charter or to adopt new articles of association on behalf of the whole company, their acts may be ratified by the remaining members of the company, and ratification may be implied from mere acquiescence or a neglect on the part of the dissenting share-holders to restrain the company from departing from its original constitution." Mor. on Corp., Sec. 623.

Ratification by all the share-holders of an act void as in excess of the powers of the company, under any circumstances, would not effectually charge the corporation. But when the question is, as here, as to the adoption or non-adoption by share-holders of an amendment to the charter, and

the officers and agents have been suffered to use the power, very slight evidence would be sufficient to amount to evidence of acceptance by the shareholders. Certainly the contract in question was within the apparent scope of the power of this company, and a stranger, in good faith dealing with it, had a right to assume that the necessary steps had been taken to accept the power its officers were assuming to have, and the company must be held estopped to show that a majority of its share-holders had not accepted it.

Was this amendment fundamental, or merely auxiliary? The Act does not, and in the nature of the question could not, define the two classes of amendments. With respect to the distinction between the two classes of amendments we must look to the common law for the principles which distinguish them. Whether the Act is to be construed as arbitrarily imposing amendments not fundamental, or as requiring their acceptance by a majority of the corporation, or by the directors, as is admissible upon some of the authorities, it is not necessary for us to determine.

With reference to what are auxiliary amendments, the cases seem in hopeless conflict. There are cases going so far as to hold that any alteration, no matter how immaterial, which in any way affects the contract between the corporation and its stockholders is to be regarded as fundamental. The case of *Zabriskie* v. *Hackensack*, 18 N. J. Eq., 185, is a leading case for this doctrine. See also Potter

on Corp., Secs. 40, 41. But the weight of authority seems to sustain a more moderate and reasonable view, and to support the doctrine that if the amendment does not change the character of' the business, and simply authorizes its reasonable extension upon the lines of the original project, that a majority of the corporators, and in some instances the directors alone, may accept and conclude all the stockholders by their action. The cases are arrayed upon this view by a very late and learned author, and need not be here considered. Beach on Corporations, Sec. 42.

In view of the consequences imposed by our Act, when an amendment is proposed, both to the corporation itself as well as to stockholders incapable of consenting, it would seem to be the sounder rule that only very material amendments, radical and vital in their character, should be regarded as requiring unanimous adoption.

In the view we take of the case in hand, it is unnecessary to decide whether the amendment proposed by the Act of 1889 was fundamental or only auxiliary. For the purposes of this case, we have assumed it to have been fundamental, and, hence, to require the unanimous consent of all who should continue share-holders, this being the position assumed by the learned counsel for the defendant corporation.

The next defense presented is that the plaintiff's injury resulted "from voluntary exposure to unnecessary danger."

Miller *v.* Insurance Company.

Injuries resulting from such exposure are expressly excluded from indemnity by one of the ·conditions of the policy. We do not think these words the entire equivalent of ordinary negligence. A degree of consciousness of danger is necessary before there would be that voluntary exposure to unnecessary danger required to prevent indemnity. We do not think the mere fact of the cleaning ·of a gun, not known to be loaded, is such voluntary exposure as the contract contemplated. The .accident seems to have resulted from a defect in the gun, unknown to plaintiff, whereby it was possible to discharge it by striking its butt upon the floor.

Judgment reversed, and judgment here according to the declaration, with costs.