STATE *ex rel. v.* HOLSTON TRUST Co. *et al.*

(*Nashville*, December Term, 1934.)

Opinion filed March 12, 1935.

548

Roy H. Beeler, Attorney-General, Nat Tipton, Assistant Attorney-General and L. H. Carlock and H. T. Poore, both of Knoxville, for appellant.

Cates, Smith & Long, of Knoxville, for appellees.

Mr. Justice Chambliss delivered the opinion of the Court.

In this suit the state seeks a judgment against the Holston Trust Company, of Knoxville, incorporated in Tennessee, under a banking and trust company charter, in the statutorily prescribed form which confers the power to do a general banking business. The claim is for two items: (1) A balance of interest on two deposits, aggregating $60,000, made in 1927 and 1928; and (2) $250,000 and interest, being a deposit made in June, 1930.

Recovery is also sought against certain named individuals as sureties on two bonds executed to secure the state against loss on these several deposits. The trust company is being liquidated under a receivership in a branch of this cause.

The Holston Trust Company was operated as a subsidiary branch of Holston-Union National Bank, of Knoxville, now also in receivership, having failed in the autumn of 1930. The same persons were officers of both institutions, and the stock of the trust company was owned by the stockholders of the national bank proportionately. While the charter granted to the trust company empowered it to do a general banking business and take deposits, it was originally restricted by action of its directors to a trust business. However, in 1927 and 1928, the trust company disregarded this restriction and entered the deposit field to the extent, at least, of accepting from the state two deposits of $50,000 and $10,000, respectively, executing, to secure the state, a bond with personal sureties of $100,000. It appears that the principal of these sums was repaid, and the balance of the first of the items now sued for is interest at 3 per cent. contracted to be paid on these deposits, which had been duly credited to the state on the books of the trust company.

In the year 1930 very large cash funds were realized to the state from the sale of bonds, and as part of the sale plan this money was allocated to and deposited in various banks over the state. In the carrying out of this plan, $250,000 (item two herein sued for) was deposited with the Holston Trust Company on the 30th day of June, 1930, and at the same time $500,000 with the Holston-Union National Bank.

The chancellor gave a decree against the trust company for the $250,000 deposited in June, 1930, but denied all interest and dismissed the suit as to the individual sureties. His holding was that the receiving of the several deposits was *ultra vires* as to the trust company, because it never had obtained from the state superintendent of banks a qualifying permit, following an examination, to do a deposit business, that recovery could be had only for money had and received, and that the interest contract was therefore not enforceable, nor could liability be predicated on the bonds against the sureties thereon. The Court of Appeals modified this decree. Rejecting the *ultra vires* theory, that court held the trust company liable for an interest balance of $4,299.65 on the original deposits, and gave judgment therefor against the sureties on the $100,000 bond executed in 1927 to secure these deposits; and also gave judgment against the trust company for the $250,000 deposited June 30, 1930, but held that the bond for $500,000 given to the state to secure that deposit had been executed conditionally and had not been bindingly approved and so accepted by the state as to designate the trust company a depository, and that therefore the sureties were not liable thereon. *Certiorari* was granted on petitions by both parties to the controversy, and argument has been heard in this court. The state complains of the failure of the Court of Appeals to give judgment on the bond against both the trust company and the sureties for the principal deposit with interest; the trust company challenges the amount of the judgment against it; and the sureties on the $100,000 bond deny liability for interest on the original deposits. The record is a large one, and the questions have been elaborately and ably briefed.

■ It may be said, first, that we agree, as concurrently found by the chancellor and the Court of Appeals, although on varying grounds, that the Holston Trust Company is liable for the full sum of $250,000 deposited with it on the 30th of June, 1930. Predicated on the *ultra vires* theory, the argument is made that the *quantum meruit* rule applies, and that thereunder recovery should be limited to "benefits received," supporting this insistence by citation of authorities. But, while these authorities announce this general rule, we are unable to agree with counsel in their application of the phrase "benefits received."

It appears that, when this fund was transmitted to Knoxville from a Nashville bank, by direction of the state representatives, the $250,000 allocated to the trust company was placed to its credit in the Holston-Union National Bank, in whose banking quarters the subsidiary trust company had its place of business, and with whom it kept its funds. At once $100,000 of the fund was paid, by cross-entries, to the national bank, in liquidation of an indebtedness of the trust company to the national bank. The bulk of the remainder was later invested in securities of doubtful value, some since proven to be practically worthless. Now the contention made for the trust company is, as we understand it, that the decree of the state should be limited to (1) the $100,000 used by the trust company in discharging its debt to the national bank; (2) the amount of money remaining in the account ($20,771.23), after payment for the securities mentioned; and (3) the securities themselves, or their value as may be realized. In other words, that these securities were purchased for the state from its funds and became its

investments. In this connection we quote from the opinion of the Court of Appeals:

"Nor are we impressed with the insistence that, having received cash or its equivalent in this deposit, the obligation can be discharged in the delivery to the State of securities, lawfully purchased with the fund, that have depreciated from what was thought, by the Trust Company, to be their value when it purchased them in the course of its ordinary business.

"Benefits should be recovered as of the kind and date received. It would operate fraudulently to allow a deposit of cash or its equivalent to be long afterwards returned in depreciated securities of any kind purchased with it, by and for the benefit of the Trust Company. It was money it received at the time, requiring no other proof as to par value. It evidently used it in settlement of its obligations and in the transaction of its legitimate business,—and while it may appear that the company needed a better guardianship than that afforded by its directors, such need, if there was such, would rather evidence their delinquency, than afford an excuse for the failure to account for the State's money which the Company took and used, though mayhap improvidently."

We concur with the Court of Appeals. If we should concede, as we do not, the application of the *ultra vires* doctrine, we would hold that the measure of the recovery is fixed by the amount of money deposited —that this was the benefit received.

But, even if the transaction were held to be *ultra vires,* this defense would not be open to the trust company. As said by Mr. Justice WILKES in *Tennessee Ice Co.* v. *Raine*, 107 Tenn., 151, 158, 64 S. W., 29, 30,

"there is a uniformity in the decisions that either party to an *ultra vires* contract, while retaining the benefits, is estopped to plead that the contract was *ultra vires*, in order to defeat recovery." Moreover, we agree with the Court of Appeals in rejecting altogether the application of the *ultra vires* doctrine in the instant case, for reasons hereinafter stated.

█ The Court of Appeals properly holds the trust company and the sureties on the $100,000 bond liable for the interest item of $4,299.65. This interest was contracted to be paid on the deposits. Moreover, it was a customary and generally recognized as reasonable charge on deposits of state funds. The amount was regularly computed from time to time and credited accordingly to the state, and we find no sound reason for disaffirming the decree of the Court of Appeals in this regard.

█ We come now to the issue most seriously contested, that of the liability of the signers of the bond given the state in June, 1930, in connection with the deposit of $250,000. As has been stated, both courts, for different reasons, have released these sureties, who were all officers and directors, or both, of the trust company. The chancellor thus stated his conclusions on this phase of the case: "That said bonds were signed by said sureties whose names appear thereon solely upon the condition that said bonds should not be delivered or take effect until the defendant Holston Trust Co. had been made a bank of deposit or authorized to carry on a general banking business in the manner and form required by the laws of Tenn.; that the defendant Trust Co. was never qualified or authorized to carry on a banking business and accept deposits, as required by the laws of

Tenn. or any of her officials and that said bonds came into the physical possession of some official of the State without lawful authority; that there was never any lawful acceptance or approval of said bond; and that the contracts relating to the deposits being unlawful and void as an act *ultra vires* defendant corporation, said bonds are likewise of no lawful force and effect; for and on account of all of which no action can be maintained thereon, either against the principal or the sureties thereto.''

The Court of Appeals appears to have adopted in part the chancellor's views, but rejected his application of *ultra vires*. As already indicated, we find no basis for the application of this doctrine to the contract before us. The distinction must not be overlooked between the want of organic charter power to contract and the exercise of such a power without preliminary compliance with regulatory conditional requirements of statutes or public policy. See quotation hereinafter incorporated from the opinion in *Ohio Ins. Co.* v. *Merchants' Ins. Co.,* 11 Humph., 1, 53 Am. Dec., 742. An illustration of this distinction is found in the opinion in *Eastern Products Corporations* v. *Tennessee Coal, Iron & R. Co.,* 151 Tenn., 239, 259, 269 S. W., 4, 40 A. L. R., 1483. The distinction suggested was clearly brought out in that opinion. In that case the executory contract was held unenforceable by the corporation because it had not complied with requirements or capitalization as a basis of credit essential to performance on its part of the mutual obligations arising. But it was emphasized that the *ultra vires* doctrine was not involved or applicable. The organic corporate power existed. Illustrations of cases of failure to comply with statutory requirements which

precluded recovery by the delinquent corporation were given, among them, failure of a foreign corporation to file its charter in this state; failure of a corporation to comply with the Blue Sky Law in a requisite case; or failure to pay a privilege tax, when subject to it. What we have here is another illustration of this class, a failure to comply with a regulation calling for examination and certification by the state bank superintendent. The result of noncompliance in this class of cases is, by way of penalty, to deprive the delinquent party of the right otherwise existent to enforce the contract. Even in such cases the penalty is not enforced against the other contracting party, but, in effect, in his favor. *Ultra vires* is "the modern technical designation, in the law of corporations, of acts beyond the scope of their powers, as defined by their charters or acts of incorporation." This is the definition given by Bouvier (Baldwin's revision). And this is followed by this quotation from 13 Am. L. Rev., 632: "A term used to express the action of a corporation which is beyond the powers conferred upon it by its charter, *or the statutes under which it was instituted.*" The words we italicize are pertinent to the Federal decisions relied on for the Trust Company, dealing with the contracts of National Banks, a class of corporations whose *powers* are fixed by the statutes under which they are instituted, a class of corporate institutions unique in several respects.

In our leading case of *Miller* v. *Insurance Company*, 92 Tenn., 167, 183, 21 S. W., 39, 43, 20 L. R. A., 765, Mr. Justice LURTON quotes approvingly from *Sherwood* v. *Alvis*, 83 Ala., 115, 118, 3 So., 307, 3 Am. St. Rep., 695, STONE, C. J., as follows: "The distinction is between the entire absence of authority in the organic law itself, and

a failure to comply with some prerequisite which the law has made a condition precedent to the exercise of corporate functions. In the one case there is a want of power, and in the other only an abuse of power conferred." The most that can be said of the case before us is that there was, not a want of corporate power, which is *ultra vires*, but an abuse of power conferred, in failing to comply with the preliminary requirement prescribed. This does not render the contract *ultra vires*. And for another reason, noted in the opinion of the Court of Appeals and stressed on the brief of counsel for the state, we do not conceive that failure to obtain this permit divested the trust company of its corporate power in the exercise of which it bound itself to repay this deposit. This requirement is found in the Banking Act of 1913, chapter 20, First Extra Session (section 24), and is carried into the 1932 Code as section 6031, and reads as follows:

██ ██ "Before any corporation, firm, or individual shall open or commence the transaction of business as a bank in this state, it shall first submit its affairs to an examination by the superintendent of banks, who shall ascertain whether the provisions of the law regulating the incorporation of banking corporations have been complied with, and whether the full amount of capital stock with which it proposes to commence doing business has been paid in. If he shall find these things to have been properly done, he shall then issue a certificate authorizing them to operate and carry on a business of banking."

A succeeding section (31) provides the penalty for violation of this requirement (Code, sec. 6040), as follows:

"Any person who shall transact any business as an officer or agent of any bank incorporated, or of any firm or individual banker commencing business, before such bank, firm, or individual banker is authorized to transact business as a bank by the permit of the superintendent of banks, shall be guilty of a misdemeanor, and be fined not less than one hundred dollars nor more than one thousand dollars."

It is a well-settled rule that, where the making of a contract is not prohibited in terms, but a penalty is pronounced against one of the parties for the making of the contract, the presumption arises that the legislative intent was to punish the designated offender only, leaving the contract open to enforcement by the other party. See 13 C. J., pp. 499, 500. Statutes against usury and lotteries afford illustrations. The principle has been applied under statutes prohibiting banks, or other corporations, from issuing bills or other securities; or banks from taking a deposit payable at a future day; or dealings between directors and their corporations; or prohibiting or regulating the loaning of public funds. The principle applies that only the party whom the law was designed to protect can take advantage of it  Among numerous cases in point, see *National Bank of Genesee* v. *Whitney*, 103 U. S., 199, 26 L. Ed., 443; *Bowditch* v. *Insurance Co.*, 141 Mass., 292, 4 N. E., 798, 55 Am. St. Rep., 474; *Savings Bank of San Diego County* v. *Burns*, 104 Cal., 473, 38 P., 102; and *Hanover Bank* v. *Burlingame Bank*, 109 F., 421, 48 C. C. A., 482, holding that, where a statute commends certain parties to do, or prohibits them from doing, certain acts, and prescribes the penalty for the violation of its commands, courts may not inflict other penalties for its violation on other per-

sons not named in the law by avoidance of their contracts.

In the course of the lengthy and learned opinion of TOTTEN, J., delivered in 1850, in the case of *Ohio Life Insurance Co.* v. *Merchants' Insurance Co.,* 11 Humph., 1, 53 Am. Dec., 742, he gives recognition to two phases of the question now before us. On pages 29 and 30 of 11 Humph., he says:

"We have seen in a former part of this opinion, that the corporation had power under its charter, to borrow money, draw or purchase drafts or checks, and provide agencies for their acceptance and payment as incidental to the proper use and enjoyment of its franchise; and in a word, that so far as relates to the question of power, the corporation had the power and capacity, as another person, to be a party to any of the contracts and agreements stated in the bill, and that it has incurred whatever obligation they were intended to impose.

"Whether those contracts were made in violation of public policy, is a different question, not going to the powers inherent in the corporation, in virtue of its charter. This latter question would be alike applicable to natural persons as to this corporation, and it arises only upon an abuse of conceded powers to purposes and objects which are prohibited."

And on page 14 of 11 Humph., after having suggested a distinction between being *in delicto* and being *in pari delicto,* the opinion proceeds:

"Now in what circumstances may it be said, that a party to an illegal transaction, is *in pari delicto?* This question will be best resolved by referring to some of the cases. In *Browning* v. *Morris,* Cowp., 792, Lord MANSFIELD says: 'where contracts or transactions are

prohibited by positive statutes, for the sake of protecting one set of men from another set of men; the one from their situation or condition being liable to be oppressed or imposed upon by the other, there the parties are not *in pari delicto*; and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract.' In conformity to this principle, it has been held, that premiums paid for insuring lottery tickets, contrary to the statute, 17 Geo., 3, ch. 46, may be recovered back. *Jacques* v. *Golightly*, 2 Black, 1073. In this case, the court says, 'the statute is made to protect the ignorant and deluded multitude, who in hope of gain and prizes, and not conversant in calculations, are drawn in by the office keepers.' So, if a creditor take money as a consideration for signing a bankrupt's certificate, contrary to the statute of 5 Geo., 2, c. 24, sec. 17, the bankrupt, after having obtained his certificate, may recover it back. *Smith* v. *Bromly*, 2 Doug., 696, note. So if usurious interest be paid it may on the same principle be recovered. Now, in these several cases, it will be observed, that the money was paid on agreements made in violation of public statutes; yet, as they were made to protect one class of persons against another class, and as there was an inequality in the condition of the parties, in reference to the transactions it was held that, although *in delicto*, they were not *in pari delicto*. *Osborne* v. *Williams*, 18 Ves., 382, was decided upon the same principle. The agreement in that case, was held to be illegal as being a fraud upon the post office. Sir WM. GRANT, in delivering his judgment, observes, that 'courts' both of law and equity, have held that two parties may concur in an illegal act, without being deemed to be in all respects *in*

*pari delicto*. In *Goldsmith* v. *Bruning*, 1 Eq. Cas. Ab., 89, a marriage brocage case, the party obtaining money by the sale of her influence, must have been considered as more criminal than the purchaser; for she was decreed, first at the rolls, and afterwards upon appeal, to refund the sum which she had received. The case of *White* v. *Franklin Bank*, 22 Pick. [Mass.], 181, was also decided on the same principle. That case was on a contract by the Bank to pay money at a future day certain, in contravention of the express provisions of a public statute. The court says: 'the prohibition is particularly leveled against the Bank, and not against any person dealing with it. In the words of Lord MANSFIELD, the statute itself by the distinction it makes, has marked the criminal. The plaintiff is subject to no penalty, but the defendants are liable for the violation of the statute, to a forfeiture of their charter. To decide that this action cannot be maintained, would be to secure to the defendants, the fruits of an illegal transaction, and would operate as a temptation to all banks, to violate the statute by taking advantage of the unwary, and of those who have no actual knowledge of the existence of the prohibition of the statute, and who may deal with a bank without any suspicion of the illegality, of the transaction on the part of the bank.' This case is referred to and approved in *Atlas Bank* v. *Nahant Bank*, 3 Metc. [581], 585, [Mass.].

''In view of the authorities therefore, we assume the principle to be, that if a party acting under circumstances of necessity, or hardship, or imposition, or great inequality of condition, enter into a contract in violation of a rule of public policy, intended for his advantage and protection, it is to be considered, that although he is *in*

*delicto,* he is not *in pari delicto,* and in such case he will be entitled to recover back what he may have paid to the other party, or he may have his contract cancelled, as the case may require. *Hunter* v. *Agee,* 5 Humph., 57; *Coventry* v. *Barton,* 17 Johns. [N. Y.], 142, [8 Am. Dec., 376]; *Musson* v. *Fales,* 16 Mass., 332; Smith on Contracts, 190.''

It will be observed that the court was here dealing with a case of affirmative prohibition. The conclusions announced are even more clearly supported when, as in the instant case, the statute expresses no prohibition, in terms, but merely prescribes a requirement and attaches a specific penalty against one party only for noncompliance.

We pass now to the grounds upon which the Court of Appeals puts its holding in favor of the signers of the bond given to secure the deposit of $250,000, on June 30, 1930. Restating the facts substantially as found by the Court of Appeals, particularly pertinent to this holding, it appears that, in anticipation of acceptance of a large deposit of state funds, the board of directors of the trust company adopted a resolution, on June 20, 1930, which, with the introductory statement of its president, as shown by the minutes, reads as follows:

''The President brought to the attention of the meeting the desirability of having the Holston Trust Company enter into a general Banking business with full authority to accept deposits and conduct a banking business according to the usual and customary standards of banking under the supervision of the State Banking Department.

''The matter was fully discussed and being well understood Mr. Long moved, seconded by Dr. Nash, that,

the officers of this corporation be and they are hereby authorized and directed to make application to the commissioner of banks, for the State of Tennessee, for permission to conduct a general banking business in the city of Knoxville, in the name of the Holston Trust Company and to perform all functions usual and necessary to an institution of Banking; therefore, on permission so to do, being issued by the State Banking department, that the officers of this bank be authorized and empowered to accept deposits and to enter upon conduct of a general banking business under such rules and regulations provided by law. And that, all actions of the Board, theretofore taken, which forbid officers of this corporation from accepting deposits and conducting a general banking business, be rescinded and set aside.''

In furtherance of this plan, the bond sued on in this cause was prepared and signed by the officers and directors herein sued as sureties, and left with the secretary of the company, who was also the cashier of the national bank, to be used upon compliance by the officers with the foregoing resolution. This bond on its face declares its purpose, particularly that it is executed for the purpose of securing an anticipated and desired deposit with the trust company of state funds. While the resolution was passed on June 20th, the bond bears the date of June 25th, and was presumably not until then signed. The record does not disclose that any inquiry was made by the directors then signing as to whether or not the examination had been made and permit issued by the bank superintendent, although five days had elapsed since this had been provided for by resolution.

We think there is no doubt, as found by the Court of Appeals, that Mr. Russell, secretary of the trust com-

pany, writing on the stationery of the Holston-Union National Bank of which he was cashier, transmitted this bond for $500,000 by mail on that evening to Nashville, sending it to the office of the commissioner of highways, where it was received on the morning of the 26th. The bond thus came into the hands of the chief clerk in the highway commissioner's office. It is apparent, from the record as a whole, that it was sent to that office of the state because the funds for distribution in the banks were highway funds. The bond was then taken to the office of the state treasurer for approval and, in his absence, approved by his chief clerk, or assistant, signing the name of the treasurer; next, to the state comptroller and approved by him in person; and next to the office of the commissioner of finance and taxation and, in his absence, approved by his chief clerk, or assistant, signing his name. The commissioner of finance and taxation says that this was according to custom and by authority. The three officials mentioned were members of, and constituted a majority of, the state funding board, whose province it was to approve the depositories selected for these state funds. Upon being advised that the bond had been approved and accepted, the highway officials caused the funds to be transmitted to the Holston Trust Company. We do not dwell upon or regard as material other details of this transmission.

Now the contention made for the sureties is, in brief, that (1) the bond was executed by them on condition that the permit of the superintendent of banks, provided for by the resolution of June 20th, should be issued before the bond was delivered, or any deposit received; and that (2) the state officials did not comply with the governing law in their approval and acceptance of the

bond. The Court of Appeals took the view that the informal approval and acceptance of this bond above recited failed to effect a binding delivery of the bond to the state, and that, despite the fact that the deposit was thereafter, on the 30th of the month, made on the faith of it, the signers of it were not bound. That opinion appears to rest this conclusion largely on the alleged "delinquency" of the state officials involved in failing to proceed with greater formality, for example, that it was requisite under the law that the funding board should have acted in formal session.

With respect both to this view and to the contention also made that this deposit could not be so lawfully delivered as to make the signers liable upon the bond until a permit had been issued by the bank superintendent, we are of opinion that a fundamental distinction is overlooked, growing out of the relationship of the parties. Both the requirement for approval of the bond and that for the issuance of a permit are designed for the protection of the depositor, and may not be converted into a shield from liability of the depository. This appears to us too clear for dispute as to the approval of the bond by the depositor or its agents. The reason of this requirement for approval has no basis other than the protection of the depositor. He might ordinarily waive it altogether, and certainly "delinquencies" of his representatives, however subject to criticism and even, in a given case, possible prosecution, or penalty, if loss resulted, could not be used by the depository to avoid its liability. What possible difference could it make to the trust company, or its sureties, that the state officers had failed to go through certain formalities, however prescribed, in acceptance of this bond? The funds

were sent forward to, and accepted by, the trust company on the faith of it. Numerous authorities cited on the briefs sustain this view, among them *Board of County Commissioners of Hennepin County* v. *State Bank*, 64 Minn., 180, 66 N. W., 143, 145, holding that "the provisions of the statute relating to the designation of county depositaries were for the benefit of the public, and not for the sureties"; *Linz* v. *Eastland County* (Tex. Com. App.), 39 S. W. (2d), 599, 604, 77 A. L. R., 1466, holding that "statutory provisions with reference to the approval of bonds are made for the protection of public funds, and not for the benefit of the sureties, and a surety who executes a bond and delivers it to the proper authorities, and upon the faith of which public funds are delivered to the principal, cannot defend against liability on the bond on the ground that same had never been approved." The opinion quotes with approval from Mr. Murfree, who, in his work on Official Bonds, sec. 59, says: "It is safe to say, however, that no law which requires of an official person the duty of examining and approving an official bond can be so far mandatory as that his neglect to discharge his duty, can release the obligors from the liability they incur by its execution, if under it, the office has been assumed and duty performed, or neglected." The principle announced by Mr. Murfree has direct application here. In *Davidson County* v. *Western Nat. Bank of Mitchell*, 58 S. D., 141, 235 N. W., 370, 371, the court pointedly remarks: "The approval of the bond is not for the benefit of the sureties, and it is not a matter of concern to them whether it is ever approved," etc. See, also, *Maryland Casualty Co.* v. *Pacific County*, 245 F., 831, 835, 158 C. C. A., 171, which is also cited for the sureties.

But, while the court held that there had been no acceptance of the bond in that case, we understand from the opinion that the court was fully committed to the proposition that, ''where the bond has in fact been acted upon, to that extent it will constitute no defense that it has not been properly approved or filed as required by law.''

The second theory of the defense urged by counsel seems, perhaps, the more plausible, although not adopted by the Court of Appeals. This is the theory, not applicable to the company, but to the sureties only, that the bond was executed by its surety signers on the condition that a permit should first be obtained from the superintendent of banks before this deposit should be received, and consequently before the bond should be delivered and liability thereon attach.

If the sureties were outsiders, strangers to the trust company's operations, and without presumed knowledge of its financial condition, its solvency, this contention would seem more plausible. Reason would then appear why they might insist that they had the right, for their own protection, to have the assurance of the condition of their principal that would be afforded by an examination and certification by the state examiner. But this reason largely fails when applied to these sureties. They are presumed to know these facts of importance. At no time can an official or other examination be relied on by these directors and officers to excuse their ignorance of the financial condition of the institution which they officer and direct. There were no other depositors to be affected, and stockholders are not concerned, since the trust company is liable for the sum deposited, as already found, in any event.

But we do not think that these sureties are

in position to rely on this defense of conditional execution for another and conclusive reason. As fully set forth in the opinion of the Court of Appeals, they left this bond after signing with Mr. Russell, the secretary of their company, and thus made him their agent, and we are unable to see that he did not act within the *apparent* scope of his authority in delivering this bond to the state officials. It is urged that these state officials should have known, were chargeable with notice, that the trust company was not qualified to do a deposit business. They were chargeable with notice of the trust company's charter powers, which expressly included this power. As said by Mr. Justice LURTON in *Miller* v. *Insurance Co., supra*: "One dealing with this corporation is bound to take notice of the statute and its amendments under which it was doing business." That is, its charter powers. "He was not bound to go any further." And we quote again from that opinion: "Where an act or contract is within the apparent scope of its charter, and the defect in power depends upon some extrinsic fact peculiarly within the knowledge of the officers and agents of the corporation, and is unknown to the person so dealing, then there is no presumption," etc. And so it was held in that case that, having found that a certain amendment to its charter had been granted, one dealing with the corporation, finding the corporation engaging in business pursuant thereto, was not chargeable with notice that the stockholder had failed to accept and ratify the amendment. By analogy, one dealing with this corporation, finding it with full charter power to receive deposits, is not chargeable with notice that it had failed to take certain steps required to qualify it to do so. Moreover, some, at least, of these state officials, had them-

selves made the deposits before mentioned of $50,000 in 1927 and $10,000 in 1928, with this identical institution, and thus were affirmatively on notice that this bank was, or had been, doing a deposit business.

That it is the state here concerned is not adversely material. No higher rights are being asserted for the state in this regard than for the humblest individual. Its sovereignty, which renders it immune from suit without its consent, and enables it to disregard statutes of limitation and confers other exclusive prerogatives, is laid aside. But it should, at least, have equal rights and be bound by no greater restrictions in assertion of them than its citizens generally. And, for illustration, we doubt that it would be seriously contended that an individual whose funds were deposited with and accepted by this trust company, in ignorance of its failure to qualify in the respect in question, would be prejudiced in any manner or degree in the assertion of his right to recover such funds; nor would he be denied recovery on any bond given him by the acting officer of the trust company to secure his deposit, on the theory either that he had not approved the bond upon receiving it or that the signers of it had left it with the officer to be used conditionally, although running in his name.

It is well settled that, where an instrument is signed upon condition, and left with an agent of the obligors, and is by him delivered to the obligees in violation of such condition, it may be enforced against the makers, in the absence of knowledge on the part of the obligees of the existence of such conditions. *Dun* v. *Garrett,* 93 Tenn., 650, 656, 27 S. W., 1011, 42 Am. St. Rep., 937. This leading case followed *Dair* v. *U. S.*, 16 Wall., 1, 21 L. Ed., 491, and is in line with numerous decisions

cited in 21 R. C. L., pp. 966 to 968, that text stating the rule to be that, "when the surety's undertaking is complete and regular on its face and the obligee has no actual notice of conditions imposed by the surety, the latter is bound;" and, again, "the principle is that where one of two innocent persons must suffer, the loss must fall upon him who put it in the power of a third person to cause the loss." And see Stearns on Suretyship (3 Ed., 1922), sec. 109, for a statement of the law of special agency.

There is no pretense that the state officials receiving this bond and making this deposit had any actual notice of any conditions having been prescribed by the signers as to its delivery. It is suggested that, since the state department of banking and its superintendent had knowledge that no banking permit had been issued to the trust company, this knowledge should be imputed as notice to the state officials making this deposit. Even if the doctrine of constructive, or imputed, notice may be stretched so far, this notice would not be notice that the bond had been executed on condition that it was not to be delivered until a permit should have been obtained, and this is the point material to this defense. See 2 Mechem on Agency (2 Ed., 1914), sec. 1831, to the effect that notice to the one department was not notice to the other.

Giving application to these principles, and without burdening this opinion with either greater elaboration of the facts or further discussion of the numerous authorities presented for both sides by diligent counsel, we find it necessary to reverse the decree of the Court of Appeals and adjudge as herein indicated. The cause will

be remanded to the chancery court of Knox county for further proceedings, in accordance with this opinion, where all questions of cost will be determined.